**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Reinhold AMAN, Defendant–Appellant.**

**No. 93–3372.**

United States Court of Appeals,
Seventh Circuit.

Argued May 17, 1994.

Decided Aug. 4, 1994.

Francis D. Schmitz, Asst. U.S. Atty., Milwaukee, WI (argued) for U.S.

Hans Peter Koesser, Kenosha, WI (argued) for Reinhold Aman.

Before POSNER, Chief Judge, and HILL * and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

After his divorce, Dr. Reinhold Aman began mailing threatening letters to his ex-wife, her attorney, and the judge presiding over

---

* The Honorable James C. Hill, of the United States Court of Appeals for the Eleventh Circuit, is sitting by designation.

the Amans' division of assets. Dr. Aman was indicted on five counts of violating 18 U.S.C. § 876,[1] which prohibits the mailing of threatening communications. Dr. Aman was convicted of three of those counts and was sentenced to twenty seven months' imprisonment. He now appeals and challenges his conviction and sentence. We affirm his conviction, but remand for resentencing.

## I

## BACKGROUND

In early 1989, the defendant's former wife, Shirley Aman, retained Charles Phillips to initiate divorce proceedings against Dr. Aman. A trial on division of assets was conducted before Waukesha, Wisconsin County Judge Marianne Becker. After the divorce decree was issued, Dr. Aman began sending these three individuals threatening letters. Based on these letters, Dr. Aman was indicted on five counts of mailing threatening communications in violation of 18 U.S.C. § 876. Portions of the letters that were the basis of the indictments upon which Dr. Aman was convicted are set out below.[2]

At trial, the defendant testified on his own behalf. The defendant explained that, early in his academic career, he began to specialize in "maledicta," a Latin term he coined meaning bad words. Maledicta encompasses "insults, slurs, curses, threats, blasphemy, obscene words, nasty proverbs, jokes about racism, religion and professions." Tr. 168. He incorporated this expertise into an annual journal: Maledicta, The International Journal of Verbal Aggression. Dr. Aman testified that there were two ways for people to vent anger: physical aggression and verbal aggression. Verbal aggression, he explained, is the means used by "civilized people."

Dr. Aman claimed that, although his letters were a means to vent frustration and anger, they were not "true threats." With respect to the communications which formed the basis of Count 1, Dr. Aman testified that he never intended to threaten either Phillips or Judge Becker. In stating that he would "destroy" the recipients, he meant that he would destroy them professionally. Tr. 176. With regard to his statement that shooting Phillips and Judge Becker "would be too fast and too painless," he simply meant to state that these two should feel the pain that they had inflicted on him. Tr. 178. The postcard

1. 18 U.S.C. § 876 states:

   Whoever knowingly [deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service according to the direction thereon, any communication,] with or without a name or designating mark subscribed thereto, addressed to any other person, and containing any threat to kidnap any person or any threat to injure the person of the addressee or another shall be fined not more than $1,000 or imprisoned not more that five years, or both.

2. The letter that formed the basis of Count 1 of the indictment was dated August 22, 1992, and was sent to Ms. Aman's attorney, Charles Phillips. It contained the following language:

   But I will have the last laugh by exposing the corrupt Wisconsin legal system to the world and I will devote the rest of my life to destroy those two slimebags, Becker and Phillips. Speaking of destruction of foul legal scum, one reads more and more news stories about judges and lawyers being killed (in courtrooms) by decent people driven to extremes by such corrupt legal slimebags. Every time I read news about yet another nasty judge or disgusting shyster killed, I rejoice: "Great! One less piece of shit to terrorize us decent

   people!" After having been fucked over mercilessly by Wisconsin legal slime, I can now fully understand and sympathize with such "killers," who really should receive an award for cleansing our world of legal vermin. Shooting Old Bitch Becker and Filthy Phillips would be too fast and too painless. Those two bastards must die a very slow and painful death, so that they can appreciate all the suffering they have inflicted on others. If there is a God or Just Fate, those two pigs—now protected by their immoral legal buddies—won't be able to get protection from all the Waukeshit storm trooper cops but will rot away like diseased sewer rats and burn forever in deepest hell, punished by a Power higher than those hypocritical, corrupt, self-important little gods at the Appeals Court and Supreme Court of Wisconsin. R.1 at 1–2.

   The communication that formed the basis of Count 4 was a postcard sent to Ms. Aman. A newspaper headline had been pasted to the postcard and read: "Man Kills Ex–Wife." R.1 at 5. Finally, the communication that formed the basis of Count 5, like that in Count 4, was a portion of a newspaper headline taped to a postcard which stated: "Estranged Wife Is Found Slain In Her Home." R.1 at 6.

which served as the basis for Count 4 ("Man Kills Ex–Wife"), Dr. Aman testified, was mailed in order to keep Ms. Aman's guilt alive and to make her spend another $125.00 reviewing it with her attorney. Tr. 187. The same was true of the post-card which served as the basis for Count 5 ("Estranged Wife Found Slain In Home"). Dr. Aman explained that he mailed the postcard with the same "mischievous intent." Furthermore, he stated, the communication could not have applied to his ex-wife because they were already divorced and "estranged" meant that "you are not divorced yet." Tr. 189.

After the close of evidence, the court held a jury instruction conference. At this conference, Dr. Aman's counsel requested that the court employ the jury instruction used in the Fourth Circuit for violations of 18 U.S.C. § 871,[3] which is known as the "subjective standard." The instruction Dr. Aman submitted reads as follows:

> The defendant, Dr. Reinhold Aman is accused of mailing allegedly threatening letters to Marianne Becker, Attorney Charles Phillips and Shirley Bieschel Aman.
>
> First, you must find Dr. Aman mailed a letter addressed to Judge Marianne Becker, Charles Phillips and Shirley Bieschel Aman, containing a threat to injure Marianne Becker, Attorney Charles Phillips and Shirley Bieschel Aman.
>
> Second, that Dr. Aman intended the threat to be taken seriously and not merely as a joke or exaggeration.
>
> Third, that Dr. Aman actually intended to carry out the threat.

R. 39. The request to use this instruction was denied. Instead, the court instructed the jury according to the governing standard in the Seventh Circuit. The instruction as given reads:

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

> **First:** That the defendant knowingly deposited or caused to be deposited, in the mail, for delivery by the Postal Service, a communication containing a threat, as charged.
>
> **Second:** That the nature of the threat was to injure the person of someone.
>
> \*    \*    \*    \*    \*    \*
>
> A "threat" is a serious statement expressing an intention to inflict bodily injury upon someone, which under the circumstances would cause apprehension in a reasonable person, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner.[4]

The jury returned a verdict of guilty on three of the five counts.

At the sentencing hearing, Dr. Aman's counsel objected to a three-point increase in Dr. Aman's offense level for threatening an "official" as defined in Sentencing Guideline § 3A1.2(a). Defense counsel maintained that such an increase was not appropriate because the Sentencing Guidelines specifically referred to 18 U.S.C. § 1114 which prohibits attempts to kill a federal judge. Here, counsel argued, there had not been an attempt to kill Judge Becker, and consequently, an increase was not warranted. Sentencing Tr. 23. Dr. Aman's counsel, however, never argued that application of the revised § 3A1.2(a), which broadened the definition of "official," violated the Ex Post Facto Clause.

The district court rejected counsel's statutory argument. It stated that the post-November 1992 Sentencing Guidelines defines an official victim as "a government officer or employee, a former government officer or employee, or a member of the immediate

---

3. 18 U.S.C. § 871 prohibits the mailing of threatening communications to the President and states as follows:

> (a) Whoever knowingly and willfully deposits for conveyance in the mail or for delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the

President of the United States, ... or knowingly and willfully otherwise makes any such threat against the President, ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. Dr. Aman concedes in his brief that the instruction given properly represented the existing law in the Seventh Circuit.

family of any of the above." The court noted that there was nothing in this definition that required an intent to kill. *Id.* at 24. Applying the guidelines in effect at sentencing, the district court increased Dr. Aman's offense level by three and sentenced him to twenty-seven months' imprisonment. Dr. Aman now appeals his conviction and sentence.

## II

### DISCUSSION

Dr. Aman raises two issues on appeal. First, he argues that a subjective not an objective standard should govern violations of § 876. Second, he claims that retroactive application of the amended § 3A1.2(a) violated the Ex Post Facto Clause because it worked to his detriment. Both issues raised by Dr. Aman have been presented to this court on previous occasions. We have spoken definitively on these matters and therefore believe that the doctrines of stare decisis and precedent compel our adherence to our prior decisions. Adherence to these decisions in this case results, as we have noted earlier, in the affirmance of Dr. Aman's conviction but requires that he be resentenced.

### A. *Subjective v. Objective Standard*

The defendant first challenges his conviction on the ground that the subjective and not the objective standard for violations of 18 U.S.C. § 876 should be used. The defendant acknowledges the fact that this court has repeatedly, and recently, applied the objective standard to violations of § 876. We have recognized

> that there are two essential elements to prove a violation of 18 U.S.C. § 876, *viz,* (1) that the defendant wrote a letter addressed to a certain person containing a threat to injure the person of the addressee or of another, (2) that the defendant

knowingly caused the letter to be forwarded by the United States mail.

*United States v. Khorrami,* 895 F.2d 1186, 1191 (7th Cir.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990). In defining a "threat" for the purposes of the first element, we explicitly have held that the inquiry is governed by an objective standard: "[I]t is not what the defendant intended, but whether the recipient could reasonably have regarded the defendant's statement as a threat." *United States v. Schneider,* 910 F.2d 1569, 1570 (7th Cir.1990). Specifically, we have defined the threat requirement as a statement

> in the context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [another individual].

*Khorrami,* 895 F.2d at 1192 (quoting *United States v. Hoffman,* 806 F.2d 703, 712 (7th Cir.1986), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987)). "In demonstrating a 'true threat' 'the government is not required to establish that the defendant actually intended to carry out the threat.'" *Id.* (quoting *Hoffman,* 806 F.2d at 707).

Despite this recent affirmation of the objective standard, Dr. Aman nonetheless urges this circuit to adopt a subjective standard for violations of § 876. Under the subjective standard, the government would have to prove that (1) the defendant intended to make a threat, (2) the statement he made was in fact threatening, and (3) the defendant intended to carry out the threat. *United States v. Patillo,* 438 F.2d 13, 16 (4th Cir. 1971).[5] Dr. Aman rests his argument that the objective standard should be abandoned on the *Patillo* case from the Fourth Circuit, on dicta in *Watts v. United States,* 394 U.S.

---

5. Dr. Aman lists only the first two of these elements in his brief. His proposed jury instruction, however, contained all three. In addition, it is clear from the caselaw on which Dr. Aman relies that something in addition to the first two elements is necessary for conviction if the subjective standard is used:

> We think that an essential element of guilt is a present intention either to injure the President,

or incite others to injure him, or to restrict his movements and that the trier of fact may find the latter intention from the nature of the publication of the threat, i.e., whether the person making the threat might reasonably anticipate that it would be transmitted to law enforcement officers and others charged with the security of the President.

*Patillo,* 438 F.2d at 16.

705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), and on Justice Marshall's concurring opinion in *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). We briefly discuss these authorities below.

■ We first note, however, that we do not take lightly suggestions to overrule circuit precedent. As the Supreme Court recently has reminded us, " 'the doctrine of stare decisis is of fundamental importance to the rule of law.' " *Hilton v. South Carolina Publ. RR Comm'n*, 502 U.S. 197, ——, 112 S.Ct. 560, 563, 116 L.Ed.2d 560 (1991) (citations omitted). It "promotes stability, predictability, and respect for judicial authority." *Id.* at ——, 112 S.Ct. at 564. Consequently, absent "special justification," *Arizona v. Rumsey*, 467 U.S. 203, 212, 104 S.Ct. 2305, 2311, 81 L.Ed.2d 164 (1984), we shall not disturb the existing rule.

> Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable. At the other extreme, a different necessity would make itself felt if a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed.

*Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992) (citations omitted) (plurality opinion).[6] In *Casey*, the Supreme Court elaborated on these general principles:

> [W]hen this Court reexamines a prior holding, its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case. Thus, for example, we may ask whether the rule has proved to be intolerable simply in defying

practical workability, *Swift & Co. v. Wickham*, 382 U.S. 111, 116 [86 S.Ct. 258, 261, 15 L.Ed.2d 194] (1965); whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation, *e.g.*, *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486 [44 S.Ct. 621, 623, 68 L.Ed. 1110] (1924); whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, see *Patterson v. McLean Credit Union*, 491 U.S. 164, 173–74 [109 S.Ct. 2363, 2370–71, 105 L.Ed.2d 132] (1989); or whether facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application or justification, *e.g. Burnet, supra*, 285 U.S. at 412, 52 S.Ct. at 449–50 (Brandeis, J., dissenting).

*Id.*, —— U.S. at ——, 112 S.Ct. at 2808–09 (parallel citations omitted). As a federal intermediate appellate court, we must also inquire as to whether the law has been overruled or questioned seriously by the Supreme Court of the United States. For the reasons that follow, we do not believe the existing rule, which is determinative of the issue before us, should be disturbed.

■ First, Dr. Aman suggests that *Patillo* supports adoption of the subjective standard. In *Patillo*, 438 F.2d at 16, the Fourth Circuit determined that a defendant must have a "present intention either to injure the President or incite others to injure him, or to restrict his movement" in order to be convicted under 18 U.S.C. § 876 (prohibiting threatening communications to the president). There are several reasons to reject the test articulated in *Patillo*. First, as Dr. Aman recognizes, *Patillo* is a distinctly minority view; indeed, all other circuits addressing the issue of the proper standard to apply

---

6. See, for example, *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), in which the Supreme Court overruled *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), and stated:

> When considered together with the doubtful foundations of *O'Callahan*, the confusion wrought by the decision leads us to conclude that we should read Clause 14 in accord with

the plain meaning of its language as we did in the many years before *O'Callahan* was decided. That case's novel approach to court-martial jurisdiction must bow "to the lessons of experience and the force of better reasoning." *Solorio*, 483 U.S. at 450, 107 S.Ct. at 2933 (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406–08, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)).

under § 871 or § 876 have rejected the subjective standard. Furthermore, even the Fourth Circuit seems to be moving away from the subjective standard, at least with respect to prosecutions under § 876. Recently, that court stated:

> While Maxton is correct that Section 876 does not require that the actual recipient of the communication feel threatened, we have interpreted the statute to provide that the communication must nevertheless encompass a "true threat." If there is substantial evidence that tends to show beyond a reasonable doubt that an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury, the court should submit the case to a jury.

*United States v. Maxton,* 940 F.2d 103, 106 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 398, 116 L.Ed.2d 347 (1991). Finally, we do not believe that the subjective test effects the purposes of § 876 as well as the objective test. As the Eighth Circuit recently explained when urged to adopt the subjective test:

> The sections of the Code on which these two counts were based, 18 U.S.C. §§ 871 and 876, recognize in their terminology that it is the making of the threat that is prohibited without regard to the maker's subjective intention to carry out the threat. The threat alone is disruptive of the recipient's sense of personal safety and well-being and is the true gravamen of the offense.

*United States v. Manning,* 923 F.2d 83, 86 (8th Cir.), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991). Similarly, the Ninth Circuit determined that the purpose behind § 871 was not simply to prevent assaults on the President, but also to prevent the threats themselves which cur-

tailed presidential activity. *Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969).[7] We also believe that at least one of the aims of § 876 (and its presidential counterpart) is the preservation of the recipient's sense of personal safety. The objective and not the subjective standard best accomplishes this aim.

In addition to *Patillo,* Dr. Aman also points to language in two Supreme Court cases that, in his view, supports adoption of the subjective standard. Dr. Aman first cites dicta from *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In *Watts,* the Court expressed "grave doubts" that the willfulness element of 18 U.S.C. § 871 required only that "the speaker voluntarily uttered the charged words with 'an *apparent* determination to carry them into execution.'" 394 U.S. at 707, 89 S.Ct. at 1401 (emphasis added by citing court). We do not believe that this language can be applied to prosecutions under 18 U.S.C. § 876. Although there are similarities between the provisions, 18 U.S.C. § 876 does not require that the threat be made "willfully," as § 871 requires, but only "knowingly." Consequently, even if this dicta suggests application of a subjective standard for prosecutions under § 871, it does not suggest application of a subjective standard for prosecutions under § 876.[8] Furthermore, for the reasons set out above, most courts have rejected the subjective standard even for violations of § 871. *See, e.g., Roy,* 416 F.2d at 877 ("This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally make a statement ... in a context ... wherein a reasonable person would foresee that the statement would be interpreted ... as a serious expression of an intention to inflict bodily harm upon ... the President.... The statute does not require

---

**7.** The Ninth Circuit stated:
> Thus, it appears that the statute was designed in part to prevent an evil other than assaults upon the President or incitement to assault the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life.

*Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969).

**8.** *See United States v. Kelner,* 534 F.2d 1020, 1025 n. 6 (2d Cir.) (recognizing that 18 U.S.C. § 875, which prohibits interstate transmission of threatening communications, does not include a "willful" requirement and that use of the objective standard could be justified on this basis), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

that the defendant actually intend to carry out the threat." (footnotes omitted)).[9]

Finally, Dr. Aman offers language from the concurring opinion of Justice Marshall in *Rogers v. United States*, 422 U.S. 35, 47, 95 S.Ct. 2091, 2098–99, 45 L.Ed.2d 1 (1975), in support of the subjective standard.

> Under the objective construction by contrast, the defendant is subject to prosecution for any statement that might reasonably be interpreted as a threat, regardless of the speaker's intention. In essence the objective interpretation embodies a negligence standard, charging the defendant with responsibility for the effect of his statements on his listeners. We have long been reluctant to infer that a negligence standard was intended in criminal statutes.... We should be particularly wary of adopting such a standard for a statute that regulates pure speech.

Although we owe the view of a single Justice great respect, we cannot treat it as stating the governing law. Here, as we have discussed, the weight of authority is to the contrary. Therefore, finding no compelling reason to overrule our longstanding precedent, we reaffirm that the objective standard as the proper standard for violations of § 876, and affirm the conviction of Dr. Aman on that basis.

**B.** *Application of the Ex Post Facto Clause to the Sentencing Guidelines*

In addition to challenging his conviction, Dr. Aman also challenges the three-level enhancement he received for threatening an "official victim." Specifically, he argues on appeal that the Sentencing Guidelines in effect at the time the letter was sent to Judge Becker did not include her within the definition of "official."

At issue here is the retroactive application of Sentencing Guideline § 3A1.2(a), which requires a court to increase a defendant's offense level by three if the defendant threatened an "official." The version of § 3A1.2(a) in effect when Dr. Aman sent the letter threatening Judge Becker provided as follows:

> § 3A1.2. Official Victim
>
> If—
>
> (a) the victim was a law enforcement or corrections officer; a former law enforcement or corrections officer; an officer or employee included in 18 U.S.C. § 1114; a former officer or employee included in 18 U.S.C. § 1114; or a member of the immediate family of any of the above, and the offense of conviction was motivated by such status;
>
> .    .    .    .    .
>
> increase by 3 levels.

U.S.S.G. § 3A1.2(a) (1991). Under this version, Judge Becker was not an official victim and thus Dr. Aman's offense level could not have been increased.

This section, however, was amended effective November 1, 1992, and consequently the amended version was in effect when Dr. Aman was sentenced. The amended guideline greatly expanded those who could be an "official victim" for purposes of the enhancement. Under the amended guideline, a sentencing court was instructed to increase the offense level by three if "the victim was a government officer or employee; a former government officer or employee; or a member of the immediate family of any of the above, and the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a) (1992). Judge Becker fell within this definition of "official victim" and therefore the sentencing court increased Dr. Aman's offense level accordingly. The increase in offense level translated into an increase in sentence as well; the applicable sentencing range increased from 18–24 months to 27–33 months.

■ Dr. Aman submits that retroactive application of the newer guideline, which includes Judge Becker within its definition, results in a harsher sentence, and therefore

---

9. *See also United States v. Kosma*, 951 F.2d 549, 556 (3d Cir.1991) (stating that subjective test "defies the purposes behind the Congressional enactment of § 871"); *Kelner*, 534 F.2d at 1025 n. 6 (stating that "cases decided since *Watts*

under the *Watts* statute have almost uniformly held that no proof of actual intent to carry out the threat is required by the use of the word 'wilfully' ").

violates the Ex Post Facto Clause. We note, at the outset, that Dr. Aman failed to make this argument below and, consequently, this argument must be deemed waived. *See United States v. Rivero*, 993 F.2d 620, 623 (7th Cir.1993). Nevertheless, because "[a] sentence based on an incorrect guideline range constitutes an error affecting substantial rights," *United States v. Robinson*, 20 F.3d 270, 273 (7th Cir.1994), we shall reverse if we find plain error.

█ Although there was an earlier debate in this circuit regarding the applicability of the Ex Post Facto prohibition to the Sentencing Guidelines,[10] the issue now has been decided. In *United States v. Seacott*, 15 F.3d 1380 (7th Cir.1994), this court determined that the Ex Post Facto Clause prohibited the application of a newer, more severe, guideline to a defendant. Every circuit addressing this question has come to the same conclusion.[11] Indeed, the government has conceded this point on appeal. Consequently, we follow the law as established in *Seacott* and recognize that retroactive application of a stricter guideline implicates the Ex Post Facto Clause.

Applying the amended guideline inflicted greater punishment on Dr. Aman and consequently violated the Ex Post Facto Clause. We hold therefore that it was plain error for the district court to apply the 1992 guidelines which resulted in an increased sentence for Dr. Aman.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed, the sentence is vacated, and the case is remanded to the district court for resentencing.

JUDGMENT AFFIRMED, SENTENCE VACATED AND REMANDED.

---

**10.** *Compare United States v. Bader*, 956 F.2d 708, 709 (7th Cir.1992) (stating in dicta that Sentencing Guidelines, like the parole guidelines, do not implicate the Ex Post Facto Clause) *with United States v. Bradach*, 949 F.2d 1461, 1465 n. 5 (7th Cir.1991) (noting in dicta that the Ex Post Facto Clause prohibits retroactive application of a revised guideline when the change would disadvantage the defendant). *See also United States v. Schnell*, 982 F.2d 216, 218 (7th Cir.1992) (stating that "[t]his circuit ... has sent inconsistent signals on the question").

**11.** *See, e.g., United States v. Cherry*, 10 F.3d 1003, 1014 (3d Cir.1993) ("As a general rule, sentencing courts must apply the guidelines in effect at the time of sentencing, not the time of the crime; it is only where application of the guidelines in

effect at sentencing results in a more severe penalty that Ex Post Facto Clause problems arise and courts must apply the guidelines in effect at the time of the offense."); *United States v. Mills*, 9 F.3d 1132, 1136 (5th Cir.1993) ("Only when that version would produce a more severe punishment, and thus implicate the Constitution's proscription of ex post facto laws, will an earlier version of the guidelines be applied at sentencing; and such was not the case here."); *United States v. Kussmaul*, 987 F.2d 345, 351 (6th Cir. 1993) ("The clause demands that where Congressional revision of the Federal Sentencing Guidelines 'changes the legal consequences of acts completed before its effective date' to the detriment of the convict, the Guidelines in effect at the time of the criminal act must be applied.").